IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br>    801 Market St., Ste 1000 <br>    Philadelphia, PA 19107 <br><br>            Plaintiff, <br><br>            v. <br><br> MEDSURANT HOLDINGS, LLC <br>    100 Front St, Ste 280 <br>    West Conshohocken, PA 19428 <br><br> MEDSURANT, LLC <br>    1660 S. Albion St, <br>    Denver, CO 80222 <br><br> MEDSURANT OPERATING, LLC <br>    1660 S. Albion St, <br>    Denver, CO 80222 <br><br>            Defendants | Civil Action No. _____ <br><br><br><br> <u>COMPLAINT</u> <br><br><br> JURY TRIAL DEMAND |

## NATURE OF THE ACTION

This is an action under the Equal Pay Act of 1963 to restrain the unlawful payment of wages to employees of one sex at rates less than the rates paid to one or more employees of the opposite sex, to collect back wages due to Gina DiCarlo as a result of such unlawful payments, and to collect damages for retaliation and constructive discharge, and under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of sex and retaliation and to provide appropriate relief to Ms. DiCarlo. As alleged with greater particularity below, the United States Equal Employment Opportunity Commission alleges Defendants discriminated against Ms. DiCarlo by paying her lower wages than it paid to one or more male counterparts for performing equal work and that Defendants

intentionally did so on the basis of sex, that Defendants unlawfully retaliated against Ms. DiCarlo, and that Defendants' discriminatory and retaliatory conduct caused Ms. DiCarlo's constructive discharge.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 16(c) and 17 of the Fair Labor Standards Act of 1938 (the "FLSA"), as amended, 29 U.S.C. §§ 216(c) and 217, to enforce the requirements of the Equal Pay Act of 1963, codified as Sections 6(d) and 15 of the FLSA, 29 U.S.C. §§ 206(d), 215(a)(3) ("EPA"), and pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-5(f)(1) and (3) ("Title VII") and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Middle District of Tennessee.

## PARTIES

3. Plaintiff, the Equal Employment Opportunity Commission ("Commission"), is the agency of the United States of America charged with the administration, interpretation and enforcement of, *inter alia*, the Equal Pay Act and Title VII, and is expressly authorized to bring this action by Sections 16(c) and 17 of the FLSA, 29 U.S.C. §§ 216(c) and 217, as amended by Section 1 of Reorganization Plan No. 1 of 1978, 92 Stat. 3781, and Public Law 98-532 (1984), 98 Stat. 2705, and by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1), (3).

4. Medsurant Holdings, LLC is a Delaware limited liability company which operates under the trade name Medsurant Health (hereinafter "Medsurant Health").

5. At all relevant times Medsurant Health has continuously been doing business in *inter alia* the State of Tennessee and the City of Nashville.

6. At all relevant times, Medsurant Health has continuously had at least 15 employees.

7. At all relevant times, Medsurant Health has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

8. At all relevant times, Medsurant Health has acted directly or indirectly as an employer in relation to employees and has continuously been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

9. At all relevant times, Medsurant Health has continuously employed employees engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(b), (i) and (j) of the FLSA, 29 U.S.C. §§ 203(b), (i) and (j) and has continuously been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(r) and (s) of the FLSA, 29 U.S.C. §§ 203(r) and (s), in that said enterprise has continuously been an enterprise whose annual gross volume of sales made or business done is not less than $500,000.

10. Medsurant, LLC is a Colorado limited liability company which also operates under the name Medsurant Monitoring (hereinafter "Medsurant Monitoring").

11. At all relevant times Medsurant Monitoring has continuously been doing business in *inter alia* the State of Tennessee and the City of Nashville.

12. At all relevant times Medsurant Monitoring has continuously had at least 15 employees.

13. At all relevant times Medsurant Monitoring has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

14. At all relevant times Medsurant Monitoring has acted directly or indirectly as an employer in relation to employees and has continuously been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

15. At all relevant times Medsurant Monitoring has continuously employed employees engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(b), (i) and (j) of the FLSA, 29 U.S.C. §§ 203(b), (i) and (j) and has continuously been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(r) and (s) of the FLSA, 29 U.S.C. §§ 203(r) and (s), in that said enterprise has continuously been an enterprise whose annual gross volume of sales made or business done is not less than $500,000.

16. Medsurant Operating, LLC ("Medsurant Operating") is a Colorado limited liability company.

17. At all relevant times Medsurant Operating has continuously been doing business in *inter alia* the State of Tennessee and the City of Nashville.

18. At all relevant times Medsurant Operating has continuously had at least 15 employees.

19. At all relevant times Medsurant Operating has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

20. At all relevant times Medsurant Operating has acted directly or indirectly as an employer in relation to employees and has continuously been an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

21. At all relevant times Medsurant Operating has continuously employed employees engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(b), (i) and (j) of the FLSA, 29 U.S.C. §§ 203(b), (i) and (j) and has continuously been an enterprise

engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(r) and (s) of the FLSA, 29 U.S.C. §§ 203(r) and (s), in that said enterprise has continuously been an enterprise whose annual gross volume of sales made or business done is not less than $500,000.

22. Medsurant Health is a nationwide provider of intraoperative neurophysiological diagnostic and monitoring services to hospitals and surgeons, with such services being performed by Intraoperative Neurophysiology Monitorists ("Monitorists").

23. Medsurant Health provides intraoperative neurophysiologic diagnostic and monitoring services through wholly owned subsidiaries, which Medsurant Health refers to as its "practices".

24. Medsurant Health operates approximately seven wholly owned subsidiaries, or practices, serving different geographic regions and comprised of more than 200 Monitorists and other Neuromonitoring professionals and staff.

25. Advanced Medical Resources, LLC ("AMR") is a wholly owned subsidiary of Medsurant Health and is the practice serving Florida, Texas and Mississippi.

26. Medsurant Monitoring is a wholly owned subsidiary of Medsurant Health and the practice serving California, Colorado, Georgia, Kentucky, North Carolina, Nevada, South Carolina and Tennessee.

27. Medsurant Operating is a wholly owned subsidiary of Medsurant Health, and performs administration, human resources, payroll, benefit and other employment functions for Monitorists and other persons employed at Medsurant Health and its subsidiaries, including Medsurant Monitoring and AMR.

28. Medsurant Health and each subsidiary, including Medsurant Monitoring, AMR, and Medsurant Operating, are centrally operated and controlled, including through common officers and executive management.

29. Medsurant Operating, Medsurant Monitoring, AMR and each additional wholly owned subsidiary or practice of Medsurant Health is "managed by Medsurant Health. This management includes but is not limited to, credentialing, human resources, financial/billing operations, and day-to-day management functions."

30. Medsurant Health determined the qualifications and requirements for and duties of the Monitorist position.

31. Medsurant Health developed and/or oversees the job description, performance appraisal forms and component metrics for the Monitorist position.

32. Medsurant Health determined personnel policies applicable to Monitorists.

33. Medsurant Health determined the training requirements and assessment programs applicable to Monitorists.

34. Medsurant Health handles employee complaints from Monitorists, including with regard to discrimination or compensation, and imposes discipline on Monitorists.

35. At all relevant times Medsurant Health, Medsurant Monitoring and Medsurant Operating (collectively referred to hereinafter as "Defendant") have and continue to constitute the employer (including the joint, single and/or integrated employer) of Ms. Dicarlo and all other persons employed as Monitorists, including in the Tennessee market.

## ADMINISTRATIVE PROCEDURES

36. All conditions precedent to the institution of this lawsuit have been fulfilled.

37. More than thirty days prior to the institution of this lawsuit, Ms. DiCarlo filed a Charge of Discrimination with the EEOC alleging *inter alia* pay discrimination, retaliation and constructive discharge in violation of Title VII and the Equal Pay Act by Defendant.

38. Following the EEOC's investigative process, the agency issued a Letter of Determination dated January 19, 2023, notifying Defendant that EEOC had found Defendant subjected Ms. DiCarlo to pay discrimination, retaliation and constructive discharge in violation of Title VII and the Equal Pay Act.

39. EEOC's Letter of Determination invited Defendant to join with EEOC in informal methods of conciliation to endeavor to resolve the discrimination found to have occurred.

40. EEOC provided Defendant with proposed terms for settlement and engaged in communications with Defendant concerning settlement.

41. EEOC was unable to secure a conciliation agreement on terms acceptable to the Commission.

42. EEOC issued Defendant a Notice of Conciliation Failure on March 14, 2023.

## STATEMENT OF CLAIMS

43. Defendant is a healthcare services company providing intraoperative neurophysiologic diagnostic and monitoring services to hospitals and surgeons.

44. Monitorists monitor a patient's central and peripheral nervous system during various surgical procedures. The core duties of a Monitorist include:

    a. Confer with surgical team and confirm appropriate neurodiagnostic monitoring services and modalities;

    b. Maintain and set-up neuromonitoring equipment;

    c. Interact with patient as necessary to collect relevant medical information, explain processes and secure consent;

    d. Utilize appropriate techniques to place monitoring equipment on patient;

    e. Collect and monitor neurological data, assess data, and consult with surgeon or other medical staff; and

    f. Complete required medical reports, billing and other paperwork.

45. Monitorists perform their duties primarily on-site at various hospital and surgical locations.

46. Monitorists are subject to the same minimum qualifications, job expectations and performance requirements in the performance of their duties, which requires equal skill, effort and responsibility and which are performed under similar working conditions.

47. Monitorists share the same job description, performance criteria, and job expectations.

48. Monitorists perform their duties using the same types of equipment and processes.

49. Monitorists normally receive assigned cases and weekend call responsibilities on a rotational basis, with efforts towards the fair distribution of cases or call among Monitorists.

50. In or about 2010, Ms. DiCarlo earned an Associates of Science with a specialization in neurodiagnostics.

51. In or about 2018, Ms. DiCarlo earned a Bachelor of Science, majoring in Psychology.

52. Ms. DiCarlo has her Certification in Neurophysiologic Intraoperative Monitoring (CNIM).

53. From approximately 2010 until her hire by Defendant, Ms. DiCarlo worked as an Intraoperative Monitorist for Vanderbilt University Medical Center, a level 1 trauma center performing advanced surgical procedures and neurophysiologic diagnostics and monitoring.

54. Defendant hired Ms. DiCarlo as a Monitorist in or about October 2015, with a start date in or about December 2015 and a starting salary of $65,000.

55. Defendant initially hired Ms. DiCarlo to work in the Tampa, Florida area with AMR.

56. Defendant has and does transfer or reassign Monitorists between operating subsidiaries, regions, markets, and/or service areas.

57. In or about December 2016, Defendant transferred Ms. DiCarlo from its Tampa, Florida area to its Nashville, Tennessee area to work with Medsurant Monitoring.

58. Upon her transfer to the Nashville area, Ms. DiCarlo was the only female Monitorist in the Tennessee market.

59. While working in Defendant's Nashville area, Ms. DiCarlo's paychecks were issued by Medsurant Operating, LLC.

60. Defendant's Tennessee market comprises the service areas of Nashville, Knoxville, and Chattanooga, Tennessee, as well as Asheville, North Carolina.

61. While Monitorists may have a primary service area, Defendant assigns Monitorists in the Tennessee market to cover cases in service areas throughout the market.

62. AMR and Medsurant Monitoring both serviced geographic areas and markets within Medsurant Health's Southeast Region.

63. Medsurant Health's Southeast Region was managed by a single Medsurant Health Southeast Region Market President.

64. All Monitorists in the Tennessee market reported to the same Clinical Manager, who in turn reported to Defendant's Southeast Region Market President.

65. Ms. DiCarlo was a highly skilled Monitorist whom Defendant relied upon to train and instruct her male colleagues in the Tennessee market.

66. Because of her superior skills and abilities, Ms. DiCarlo was asked to travel away from her Nashville area and throughout the Tennessee market, including to cover complicated surgical

procedures other Monitorists could not and to permit her male colleagues to shadow and observe her in advanced modalities.

67. Ms. DiCarlo performed scheduling, case load management and other managerial duties for Defendant, including when Kylie Nystrom, the Clinical Manager for the Tennessee market, was unavailable.

68. Ms. DiCarlo developed and secured new clients for Defendant and grew business with existing clients in the Tennessee market.

69. Defendant paid Ms. DiCarlo less to perform Monitorist duties than it paid her male colleagues in the Tennessee market.

70. The table below displays the highest salaries Defendant paid to Ms. DiCarlo and one or more male colleagues as Monitorists in the Tennessee market in each year during Ms. DiCarlo's employment:

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Gina DiCarlo (F) | $65,000 | $78,000 | $78,000 | $82,000 | $84,500 | $84,500 |
| Jake Randolph (M) | $83,000 | $86,000 | $86,000 | $89,000 | $91,500 |  |
| Jeffrey Morris (M) | $95,000 | $105,000 | $105,000 | $108,000 | $111,000 |  |
| Bjorn Jorgensen (M) | $90,000 | $95,000 | $95,000 | $98,000 | $101,000 |  |
| Phil Parkinson (M) |  |  |  |  | $96,000 |  |
| Phinley Bydlinski (M) |  |  |  |  |  | $95,000 |
| Chad Berger (M) |  |  | $85,000 |  |  |  |
| James Nutt (M) | $90,012 | $93,000 | $93,000 | $97,000 |  |  |
| Phil LaPonsie (M) | $95,000 | $98,000 | $98,000 | $101,000 |  |  |
| Samuel Roll (M) | $80,000 | $84,000 | $84,000 | $87,000 | $90,000 | $90,000 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Brandon Koch (M) | $85,000 | $90,000 | $90,000 | $93,000 | $96,000 | $96,000 |
| George Jackson (M) | | $82,500 | $82,500 | $85,500 | | |
| Delmer Plank (M) | | | | | $85,000 | |

71. In early 2020 Tiffany Frye replaced Brandon Lute as Defendant's Southeast Region Market President.

72. On or about March 16, 2020, Ms. DiCarlo complained to Ms. Frye that Ms. DiCarlo was being paid less than male Monitorists in the Tennessee market even though Ms. DiCarlo performed the same duties as her male colleagues, and moreover performed additional duties beyond her comparators. Ms. Frye informed Ms. DiCarlo that she would investigate and make appropriate any adjustments.

73. Having had no response from Ms. Frye, on or about June 16, 2020, Ms. DiCarlo e-mailed Ms. Frye to again raise the issue of inequality in pay, seek a salary review, and ask that Defendant pay Ms. DiCarlo "fairly for the equivalent, and in some instances higher level, job [she] perform[s] daily in comparison" to her male colleagues.

74. Ms. Frye apologized for the delay in responding to Ms. DiCarlo's initial complaint from March 2020 and promised to promptly undertake a salary review and respond to Ms. DiCarlo with her findings.

75. Ms. DiCarlo never received a direct response from Ms. Frye concerning her March 2020 or June 2020 pay disparity complaints.

76. On August 13, 2020, after completing her cases for the day, Ms. DiCarlo went to dinner with her boyfriend in Nashville. Ms. DiCarlo did not have any scheduled cases the following day.

77. That evening, while at dinner, Ms. Nystrom notified Ms. DiCarlo, for the first time, that Ms. DiCarlo was being scheduled for a 9AM case the following morning in Chattanooga, and that Monitorist Jeffrey Morris was also being assigned to the case to observe and shadow Ms. DiCarlo during the procedure.

78. Ms. DiCarlo advised Ms. Nystrom that she could not cover the last-minute assignment for an out-of-town procedure in Chattanooga as she had consumed alcohol.

79. Ms. DiCarlo similarly notified Ms. Frye that she could not cover the case in Chattanooga, explaining that she had consumed alcohol with dinner and it would be unsafe for her to travel that evening or early the next morning. Ms. Frye nevertheless pressed Ms. DiCarlo to travel for and cover the case. Ms. DiCarlo declined.

80. Mr. Morris similarly declined to travel for and attend the case in Chattanooga.

81. On or about August 14, 2020, Defendant charged Mr. Morris and Ms. DiCarlo a PTO day for declining the Chattanooga case.

82. On or about August 18, 2020, ostensibly in response to declining the Chattanooga case, Defendant further issued Ms. DiCarlo formal discipline and advanced her directly to a final warning – instructing that any subsequent failure to follow a supervisor's request or declining any case would result in Ms. DiCarlo's immediate termination.

83. Ms. DiCarlo had no previous warnings or discipline from Defendant.

84. Ms. Frye also notified Ms. DiCarlo that because she was subject to a final warning, she was no longer eligible to receive any change in pay or promotion. This was the first and only occasion on which Ms. Frye in any manner addressed Ms. DiCarlo's compensation following her prior pay complaints and requests for pay equity.

85. Defendant did not issue Mr. Morris any formal discipline or put him on a final warning in response to the Chattanooga case.

86. Following placement on the final warning, Ms. DiCarlo was issued last-minute and unscheduled cases with more frequency and in unusual circumstances, requiring exigent planning/travel and causing disruption in Ms. DiCarlo's personal life, only for Defendant to later cancel or reassign the cases after Ms. DiCarlo had accepted and negated Defendant's ability to invoke the final warning against her.

87. Defendant intentionally created intolerable working conditions for Ms. DiCarlo, including by:

   a. paying Ms. DiCarlo significantly less than male colleagues who performed equal (or often lesser) duties;

   b. ignoring Ms. DiCarlo's complaints and requests for pay equity;

   c. retaliating against Ms. DiCarlo for complaining and treating her differently than similarly situated employees;

   d. using retaliatory discipline to justify the continued suppression of Ms. DiCarlo's wages and to harm Ms. DiCarlo's future prospects or advancement with Defendant;

   e. using retaliatory discipline to place Ms. DiCarlo under constant threat of termination and to require her to concede to any directive or request, however inequitable, biased or improper; and

   f. manufacturing conditions to facilitate Ms. DiCarlo's supposed violation of her final warning and her termination or resignation.

Case 3:23-cv-00501    Document 1    Filed 05/16/23    Page 13 of 17 PageID #: 13

13

88. In or about October 2020, in response to Defendant's discriminatory and retaliatory conduct and its creation of intolerable working conditions, Ms. DiCarlo was compelled to resign.

## Count 1 – Title VII Claims

89. EEOC hereby repeats and incorporates by reference the foregoing allegations.

90. Since at least December 2018, Defendant has engaged in unlawful employment practices in violation of Sections 703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a) by discriminating against Ms. DiCarlo with respect to her compensation because of her sex, retaliating against her for engaging in protected activity, and creating conditions so intolerable as to cause her constructive discharge.

91. The effect of the practices complained of above has been to deprive Ms. DiCarlo of equal employment opportunities and to otherwise adversely affect her status as an employee because of her sex and because she engaged in protected activity.

92. The unlawful employment practices complained of above were intentional.

93. The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Ms. DiCarlo.

## Count II – Equal Pay Act Claims

94. EEOC hereby repeats and incorporates by reference the foregoing allegations.

95. Since at least May 2020, Defendant has violated Sections 6(d)(1), 15(a)(2), and 15(a)(3) of the FLSA, 29 U.S.C. §§ 206(d)(1), 215(a)(2) and 215(a)(3) by paying Ms. DiCarlo lower wages than those paid to one or more male colleagues in the Tennessee market for performing equal work in the Monitorist position, retaliating against her for engaging in protected activity, and creating conditions so intolerable as to cause her constructive discharge.

96. As a result of the acts complained of above, Defendant unlawfully has withheld the payment of wages due to Ms. DiCarlo.

97. The unlawful practices complained of above were willful.

## PRAYER FOR RELIEF

Wherefore, the Commission requests that this Court:

A. Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with Defendant, from discriminating against females with respect to their wages or compensation and from paying female employees lower wages or compensation than one or more male comparators for performing equal work.

B. Order Defendant to institute and carry out policies, practices and programs that provide equal wages and compensation for women and eradicate the effects of its past and present unlawful employment practices.

C. Order Defendant to make whole Ms. DiCarlo by providing appropriate backpay and lost benefits with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

D. Grant a judgment requiring Defendant to pay appropriate back wages in amounts to be determined at trial, an equal sum as liquidated damages, and prejudgment interest to Ms. DiCarlo, whose wages were unlawfully withheld as a result of the acts complained of above.

E. Order Defendant to make whole Ms. DiCarlo by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above in amounts to be determined at trial.

F. Order Defendant to make whole Ms. DiCarlo by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional and mental anguish, pain and suffering, stress and anxiety, loss of enjoyment of life, humiliation and frustration in amounts to be determined at trial.

G. Order Defendant to pay Ms. DiCarlo punitive damages for the malicious and/or reckless conduct described above, in amount to be determined at trial.

H. Grant such further relief as this Court deems necessary and proper in the public interest.

I. Award the Commission its costs of this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

>Respectfully submitted,
>
>U.S. EEOC
>
>GWENDOLYN YOUNG REAMS
>Acting General Counsel
>
>CHRISTOPHER LAGE
>Deputy General Counsel
>
>DEBRA M. LAWRENCE
>Regional Attorney
>
>MARIA LUISA MOROCCO
>Assistant Regional Attorney
>
>/s/ Thomas D. Rethage
>THOMAS D. RETHAGE
>Senior Trial Attorney
>Pa. Bar. No. 203524
>EQUAL EMPLOYMENT
>OPPORTUNITY COMMISSION
>Philadelphia District Office
>801 Market St., Suite 1000

Philadelphia, PA 19107
thomas.rethage@eeoc.gov
Phone: 267-589-9756